IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:18-CV-813 |
| LOFLIN FABRICATION, LLC, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The EEOC contends Loflin Fabrication violated the Americans with Disabilities Act by requiring all employees to disclose their prescription medications to Loflin and by terminating Deborah Shrock for her failure to provide such information or, alternatively, because of a disability. Disputed questions of material fact exist as to the scope of the prescription disclosure policy, whether the policy as implemented was justified by business necessity, and how it was applied to Ms. Shrock. Loflin's motion for summary judgment will thus be denied as to the EEOC's claims about the prescription drug policy. The motion will be granted as to the EEOC's claims that Ms. Shrock was fired because of a disability and for punitive damages.

## FACTS AND EVIDENCE

The facts are stated based on a review of the evidence in the light most favorable to the EEOC as the non-moving party. When appropriate for context, the Court has recited some evidence supporting Loflin's positions.

**Loflin's Business and Facilities**

Loflin, a metal fabricating business, has about 90 employees who work in Denton, North Carolina. Doc. 34-11 at 2 (94:15–20)[1]; Doc. 34-12. Ms. Shrock began working for Loflin on July 25, 2016, as an office manager. Doc. 34-12; Doc. 34-4 at 2 (22:20). Her duties included supervising the office employees and performing human resources functions, including overseeing employment files and company policies. Doc. 34-4 at 2–3 (22:20–23:21). Her office was in the same building as the factory shop.

The factory floor is busy, and there are dangers associated with the manufacturing process and moving of heavy items. *See* Doc. 34-11 at 6–8 (100:5–102:25), 10 (107:8–14). Shop employees use welding equipment, along with other heavy equipment, such as bobcats, cranes, press brakes, bandsaws, welders, plasma lasers, and forklifts. *Id.* at 2 (94:15–24); Doc. 34-9 at 32 (175:1–23). Workers move large pieces of metal over twenty feet wide through the warehouse's shop floor aisles, where people walk. Doc. 34-9 at 32 (175:16–23); Doc. 34-11 at 2–3 (94:17–95:8). Workers also use mechanical cranes to unload large sheets of plate steel from trucks and into the aisles. Doc. 34-11 at 4–5 (96:10–97:20). Employees have been injured by lasers or falling materials or equipment, *e.g.*, Doc. 34-9 at 34–35 (181:11–16, 182:21–24), though this is relatively rare. Doc. 38-2 at 8 (noting lack of injuries to employees walking through shop aisles in past five years).

---

[1] Citations to deposition transcripts are first to the pagination appended by CM/ECF, and then in parentheses, to the page and line numbers within the deposition itself.

The administrative staff, including Ms. Shrock, walk through the shop area from time to time for a variety of reasons, such as to help with computers, to fix the time clock, to obtain employment documents, to escort visitors, or to obtain files from a storage unit in the shop.  Doc. 34-4 at 4–5 (29:17–22, 34:1–23); Doc. 34-9 at 19 (70:6–24), 25–26 (80:15–81:1), 29 (92:6–24).[2]  Anyone entering the shop area, including administrative staff, is required to wear protective gear such as goggles, ear plugs, and steel-toed boots. Doc. 38-6 at 6–7 (30:21–31:23); Doc. 34-9 at 17–18 (67:23–68:5), 20–21 (75:17–76:4).

### Loflin's Prescription Drug Policy

Because of the dangers of working around and with the equipment, Loflin has long prohibited employees from working while under the influence of any narcotic, and since at least 2017 it has conducted random drug screening tests.  Doc. 34-8; Doc. 38-6 at 24 (90:2–11); Doc. 34-9 at 4–5 (38:21–39:4) (noting revision date).[3]  Failing a drug test or refusing to take the drug test is grounds for termination.  Doc. 34-8.

For the same reason, Loflin has required employees to inform the company of prescribed medication since the early 2000s.  Doc. 34-8; Doc. 34-9 at 2–3 (35:10–36:22). According to Loflin's 30(b)(6) deponent, the purpose of this disclosure provision is to ensure Loflin knows when an employee is taking medicine that might affect the ability to safely operate or navigate around heavy equipment.  Doc. 34-9 at 2–3 (35:14–36:18).

---

[2] While it seems there is a dispute about how often Ms. Shrock and other administrative staff walked through the shop, it is undisputed that they each did so at least a few times each year. *Compare* Doc. 34-4 at 4 (29:8–16) *with* Doc. 38-3 at 19 (93:9–25) *and* Doc. 34-9 at 3 (36:5–14).

[3] If there was a written policy before 2017, it is not part of the record.

3

In the summer of 2017, Ms. Shrock and another employee, Brandy Hardee, attended an external training program on human resources issues, which confirmed concerns Ms. Shrock had about asking employees for copies of all their prescriptions. Doc. 38-6 at 11–13 (38:16–21, 40:13–41:15).  Ms. Shrock's job as office manager included filing information about employee prescriptions, *id.* at 21 (56:10–16), and she asked the owners if she could revise the policy.  Doc. 38-8 at 11 (24:10–25); Doc. 38-9 at 12–13 (17:20–18:10), 15 (20:2–7).  The Loflin owners agreed, if a disclosure provision remained.  Doc. 38-6 at 17–18 (45:24–46:5).

Ms. Shrock and Ms. Hardee discussed narrowing the policy to require disclosure only for narcotics and other prescriptions that might affect an employee's ability to do his job, Doc. 34-4 at 8–9 (44:24–45:9), but the revised policy as written did not explicitly contain that limitation.  Specifically, the revised policy read:

> Given that the work here requires the use of heavy machinery or working around heavy machinery, it is important that everyone's safety be considered. For this reason you must:
> TURN prescriptions in to HR so they can be on file before you start work. Any employee taking prescribed medications will be responsible for consulting the prescribing physician, pharmacist, or the warning labels to ascertain whether the medication may interfere with safe performance of his/her job.  If the use of a medication could compromise the safety of the employee, fellow employees or company property, it is the employee's responsibility to notify your supervisor and take a leave of absence to avoid unsafe workplace practices.  No employee is permitted to work while under the influence of a narcotic.
> If you are chosen as the random for the month, this is what will happen:
> If the test comes back positive you will be Terminated!
> If you refuse to take a drug test you will be Terminated

Doc. 34-8; Doc. 34-9 at 4–5 (38:21–39:4) (noting revision date).

The owners, management, and employees did not have a consistent understanding of the policy's scope. Co-owner Terry Ferrell testified that the policy covers "any of the narcotics, anything that would say . . . you can't operate heavy equipment, machinery," and nothing else, but he acknowledged the policy language does not reflect this distinction. Doc. 38-9 at 16–18 (60:20–62:9). Co-owner Greg Loflin, as 30(b)(6) deponent, stated that the policy did not apply to all prescriptions, Doc. 34-9 at 15 (57:11–14); rather, it "would be up to the employee and their physician" as to which prescriptions had to be turned in to Loflin. *Id.* at 7 (41:2–25). Ms. Hardee testified the policy required "mind altering prescriptions [to be] on file with HR." *Id.* at 30 (130:7–9). Loflin's 30(b)(6) deponent testified that the policy requires employees—regardless of their job function—to consult their physicians to see if any prescribed medication would interfere with being around machinery safely at work. *See* Doc. 34-9 at 2–3 (35:17–36:22), 11–12 (46:5–47:8), 15–16 (57:19–58:8).

But there was also testimony and evidence that Loflin required employees to disclose all medications. The shop supervisor, Chip Newlin, testified it applied to all prescriptions, Doc. 38-13 at 9–10 (39:5–22, 54:7–24), as did several other employees. *See, e.g.*, Doc. 38-12 at 6 (24:1–4) (employee Jason Roark stated it covered all prescriptions); Doc. 38-14 at 3–4 (12:6–13:14) (same from employee Chris Hamilton); Doc. 38-23 at 3–4 (16:18–17:1) (same from employee Shannon Sanders). Employees believed the disclosure requirement applied even if the employee took the medication outside of work hours or did not take it at all. Doc. 38-13 at 9 (39:11–22) (per supervisor Chip Newlin, policy covered medications taken at night); Doc. 38-12 at 8 (40:2–6) (per

5

employee Jason Roark, policy covered medications taken outside of work hours); Doc. 37-5 at 5 (18:4–15) (per employee Chris Hamilton, policy covered medications prescribed but not taken). And Loflin's 30(b)(6) deponent testified that the disclosure requirement arose because employees often would not consult their physicians about whether their prescriptions might impact safety and were similarly often unaware of their side effects, *see* Doc. 34-9 at 2–3 (35:17–36:22), which implicitly supports the employees' understanding that all prescriptions had to be disclosed. Since August 2017, Loflin employees have told the company about prescriptions to treat many different medical conditions, including attention deficit hyperactivity disorder, allergies, bacterial infections and skin conditions, depression, and seasonal affective disorder. *See* Doc. 37-7 at 2–3, 6–10.

Loflin's managers and owners were responsible for administering the policy, Doc. 38-3 at 4 (51:16–20), though they received no training on how to enforce or apply the policy. Doc. 34-9 at 16 (58:18–25). According to both Loflin's 30(b)(6) witness and the shop supervisor, employees were expected to "turn in a prescription to start with." Doc. 38-3 at 4–5 (51:24–52:17); Doc. 38-13 at 8 (23:13–25), 9 (39:14–22), 10 (54:10–24). If needed, the employee would discuss their prescriptions with a manager or owner, who determined if further information was needed from a physician or if the employee's work needed to be restricted. Doc. 38-3 at 4–5 (51:24–52:17); Doc. 37-4 at 4–6 (22:16–24:4).

### Ms. Shrock's Diagnosis and Discharge

Ms. Shrock saw a doctor on January 9, 2017, for neck pain. Doc. 36-2 at 1–2. While the medical record for that visit does not mention any limitation on function as a

6

result of the neck pain, and it did not explicitly connect her neck pain to the headaches she indicated she was having, *id.*, Ms. Shrock testified that the pain caused her "difficulty when turning [her] neck," such that she had to turn her whole torso instead of just looking over her shoulder. Doc. 47-1 at ¶ 2; Doc. 38-6 at 22 (72:8–15). She was prescribed a muscle relaxant to take as needed. Doc. 36-2 at 2. The medication bottle indicated side effects that included dizziness and drowsiness. Doc. 36-3 at 12–13 (73:4–74:4).

Ms. Shrock testified that she also went to the doctor on May 12, 2017, and that in addition to some unrelated health issues, she was experiencing "numbness and tingling" in her shoulders, arms, and hands at that time. Doc. 36-3 at 14–17 (75:4–78:6). She does not remember telling the doctor she had neck pain, and she testified that neck pain was not reflected in the medical report, Doc. 36-3 at 16 (77:3), which had some discussion of hand tingling related to carpal tunnel syndrome. Doc. 36-3 at 16 (77:14–23).[4] No one has pointed to any further medical treatment for this pain or tingling until after her termination.

From January to September, she took the muscle relaxant only a few times, once every two or three months, to manage the pain so it would not interfere with her sleep. Doc. 47-1 at ¶ 3. She took the medicine between 6:00 and 8:00pm. *Id.* Ms. Shrock never took the medication during work, and per her doctor's advice, she always began work at least eight hours after taking it. Doc. 47-1 at ¶¶ 4–5; Doc. 38-3 at 15 (87:9–21).

---

[4] The EEOC did not direct the Court's attention to the medical record itself or assert this visit was evidence of a disability. *See* Doc. 36-1; Doc. 38 at 4–5, 15–16.

Ms. Shrock did not submit the prescription to Loflin or inform anyone at Loflin about the prescription. Doc. 1 at ¶ 24; Doc. 9 at ¶ 24. She mentioned the neck pain to Mr. Ferrell around the time of her January doctor visit, Doc. 36-3 at 20 (86:2–15), 29–30 (142:19–143:10), but the record is otherwise silent as to any disclosures by Ms. Shrock to co-workers or the co-owners about her neck pain. *See* Doc. 36-3 at 20–21 (86:2–87:23). Ms. Shrock did not recall asking for any work modifications due to neck pain, Doc. 34-4 at 12 (87:2–5), 14 (89:8–14), and there is no evidence that she ever told her employer she was disabled or needed any accommodations or that she was unable to do all aspects of her job for any reason. *See* Doc. 36-3 at 29 (142:11–18). Her family members, who knew of her neck pain, testified that it was intermittent and did not result in any limitations in function. Doc. 34-7 at 2–3 (12:24–13:19) (husband); Doc. 34-6 at 2 (18:1–21) (daughter).

In mid-September, Ms. Shrock's neck pain got worse, causing her headaches, neck spasms, and stiffness that limited her ability to move her neck from side to side. Doc. 47-1 at ¶ 6. She also began experiencing pain down her right shoulder and arm. *Id.* There is no evidence this affected her ability to perform her job or caused any particular or identified limitations in function.

On September 20, 2017, Ms. Shrock took the prescribed muscle relaxant after work. *Id.* at ¶ 7. The next morning, Ms. Hardee told Ms. Shrock that she had been randomly selected for a drug test. Doc. 38-6 at 23–24 (89:25–90:8). Ms. Shrock told Ms. Hardee and Mr. Newlin, the shop supervisor, that she had taken prescribed

8

medication for neck pain the night before.  Doc. 34-2 at 2; Doc. 34-4 at 13 (88:4–19); Doc. 38-6 at 25 (91:13–18), 26 (94:4–7).

Chris Hamilton, a Loflin employee, was one of several employees present in the break room where drug tests were administered; he overheard Ms. Shrock ask the person giving the drug test if muscle relaxants would show up on the drug test, Doc. 38-14 at 7–10 (25:20–28:14), and it is undisputed she mentioned the medication while she was in the break room.  *See* Doc. 38-6 at 26 (94:1–13).  Ms. Shrock took the drug test, and some days later the results came back negative for all substances screened.  Doc. 1 at ¶ 35; Doc. 9 at ¶ 35; Doc. 38-2 at 7.

Before the test results came back, Mr. Hamilton told Mr. Newlin that he had heard Ms. Shrock say she was taking a muscle relaxant.  Doc. 38-13 at 12 (67:2–15).  Mr. Newlin then told Mr. Ferrell, a co-owner, about what Mr. Hamilton had reported hearing Ms. Shrock say.  Doc. 38-13 at 12–13 (67:16–68:18).  Mr. Newlin also told Mr. Ferrell that he—Mr. Newlin—had heard Ms. Shrock say that she had taken a prescription the night before and that she did not know if it was valid.  Doc. 38-13 at 13 (68:6–25).  Loflin's 30(b)(6) deponent testified that Loflin was told Ms. Shrock said she wasn't going to pass the drug test because of the muscle relaxant and was laughing about it, Doc. 34-9 at 8 (43:17–21), but the source of this information is not clear from the record.[5]

---

[5] As best the Court can tell from the excerpt of the deposition transcript provided, Ms. Shrock does not deny that she mentioned the prescription during the drug test or that she mentioned it to Mr. Newell and Ms. Hardee, but she does not believe she told the nurse she would fail the drug test.  *See* Doc. 38-6 at 26 (94:3–18) ("I do not believe I worded it that way").  Written statements signed by the employees who overheard her statements do not mention that she said she would fail the test.  *See* Docs. 38-10, 38-15, 38-16, 38-17.

9

As a 30(b)(6) deponent, Mr. Ferrell testified Ms. Shrock was fired because "she was insubordinate to our policies" in making "statements in the break room" about her potential failure of the drug test. Doc. 38-3 at 24 (138:8–15); *see also* Doc. 38-9 at 19–20 (95:19–96:8) (same in Mr. Ferrell's individual deposition, noting Ms. Shrock's role in HR). Mr. Loflin as a 30(b)(6) deponent testified that he understood Ms. Shrock had said she was going to fail the drug test and therefore he assumed she had taken a narcotic, since that was what the drug test was for. Doc. 34-9 at 9 (44:5–22).

Mr. Loflin did not determine whether the muscle relaxant was actually a narcotic before firing her, Doc. 38-8 at 14 (27:9–14) (Loflin individual deposition), and he fired Ms. Shrock before her test results came back. *See id.* at 12–13 (25:8–26:17) (before deciding to fire her, Mr. Loflin spoke with Mr. Ferrell and potentially Mr. Newlin; he did not contact Ms. Shrock or consult any documents); *see also* Doc. 34-9 at 30 (130:3–9) (per Ms. Hardee as 30(b)(6) deponent, Ms. Shrock was fired for violating company policy requiring her "[t]o have mind altering prescriptions on file with HR"; the drug test results, positive or negative, "would have had no effect"). Loflin did not evaluate whether Ms. Shrock's prescription affected her ability to work before firing her. Doc. 38-2 at 7 (co-owners did not see warning label on Ms. Shrock's medicine bottle before she was fired); Doc. 38-3 at 25–27 (139:3–140:9, 141:9–17), 31 (172:17–21), 34–36 (178:12–179:11, 180:18–25); Doc. 38-8 at 12–13 (25:8–26:10). According to Mr. Newlin, Mr. Ferrell said "he couldn't have somebody in the position she was in saying stuff like she'd said in front of employees that she was responsible for," in terms of training on and administering the drug policy. Doc. 38-13 at 16 (80:7–23).

Loflin fired Ms. Shrock on September 22, 2017, Doc. 38-7, via a phone call with Mr. Newlin. Doc. 38-13 at 15 (72:6–18). Ms. Shrock testified that Mr. Newlin said she had violated the prescription policy by not providing the prescription. Doc. 38-6 at 28 (102:15–18). In a typed statement signed by Mr. Newlin on that day, he said "it was decided" that Ms. Shrock "would be terminated for telling employees out in the shop that she has taken muscle relaxers the night before the random drug test," and that he told Ms. Shrock that "based on what she had told employees in the break room about taking muscle relaxers the night before our company drug test[,] [s]he was being terminated for not having the prescription logged in our file." Doc. 38-10.

Later that day, Ms. Shrock called Mr. Ferrell. Doc. 38-6 at 28–29 (102:22–103:2). She told him she was taking the medication for her neck and that it was a valid prescription, and she asked for a second chance. *Id.* at 28–29 (102:22–103:11). He rejected her request. *Id.* at 29 (103:12–:19). Also on September 22, Mr. Ferrell signed a Disciplinary Action Form, which noted "Debbie [Shrock] was terminated for violation of company policies." Doc. 38-7.

Ms. Shrock filed an EEOC charge on October 3, 2017. Doc. 34-1; Doc. 34-4 at 16 (110:3–14). She asserted in the form that she was not disabled but that Loflin treated her as disabled. Doc. 34-5 at 3 (Question 9).

On October 12, Ms. Shrock saw a physician and informed him she had had neck pain radiating down into her right shoulder and arm for approximately one month, and the pain was "[p]rogressive and worsening." Doc. 37-6 at 3. Based on her symptoms, a

11

diagnostic test, and an X-ray, the doctor diagnosed her with cervical disc disorder with radiculopathy.  Doc. 38-4 at ¶¶ 3–4.

Additional evidence will be discussed in the context of the issues raised.

## ANALYSIS

The EEOC asserts three claims against Loflin.  First, the EEOC contends that the prescription drug disclosure policy violates the ADA.  Doc. 1 at ¶¶ 39–41.  Second, the EEOC contends that Loflin violated the ADA by terminating Ms. Shrock's employment for her failure to disclose her prescription.  *Id.* at ¶ 42.  Third, the EEOC claims Loflin violated the ADA by terminating Ms. Shrock's employment based on an actual or perceived disability.  *Id.* at ¶¶ 43–50.  Loflin has moved for summary judgment on all claims.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Thus, "if the evidence would permit a jury to find in the non-movant's favor on a disputed question of material fact, summary judgment is inappropriate."  *EEOC v. McLeod Health, Inc.*, 914 F.3d 876, 880 (4th Cir. 2019).[6]

## I.    Prescription Disclosure Policy Claim

The ADA provides that employers "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination

---

[6] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

12

or inquiry is shown to be job-related and consistent with business necessity."  42 U.S.C. §

12112(d)(4)(A); *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 246 (4th Cir. 1997).  The

EEOC interprets this restriction on inquiries and examinations to apply to all employees,

whether or not they have a disability, U.S. Equal Emp. Opportunity Comm'n,

*Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of*

*Employees under the Americans with Disabilities Act (ADA)*, 2000 WL 33407181, at *2

(July 27, 2000) (hereinafter "*Enforcement Guidance*"),[7] and federal courts in other

jurisdictions have agreed.  *See Taylor v. City of Shreveport*, 798 F.3d 276, 284 (5th Cir.

2015) (so holding in case arising under Rehabilitation Act and collecting cases); *Lee v.

City of Columbus, Ohio*, 636 F.3d 245, 252 (6th Cir. 2011) (so holding in ADA case and

collecting cases).  Loflin does not seriously contend otherwise.[8]

    In order to prove an ADA violation based on § 12112(d)(4)(A)'s "examination and

inquiry" prohibition, the plaintiff must ordinarily show that the examination or inquiry is

likely to elicit information about a disability.  *See, e.g.*, *Bates v. Dura Auto. Sys., Inc.*,

767 F.3d 566, 578–79 (6th Cir. 2014); *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333

---

[7] The Fourth Circuit has found the EEOC's enforcement guidance to be a useful framework in evaluating a claim involving a medical examination.  *McLeod Health*, 914 F.3d at 881 n.5; *Porter*, 125 F.3d at 246 ("Administrative interpretations of the ADA by the enforcing agency (here, the EEOC), 'while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986))).

[8] In a footnote, Loflin notes the absence of a Fourth Circuit case deciding whether the employee must actually be disabled, *see* Doc. 36 at 11 n.2, but it does not argue the point.  "[I]t is not the court's job to undertake the analysis and legal research needed to support such a perfunctory argument" made in a footnote.  *Cathey v. Wake Forest Univ. Baptist Med. Ctr.*, 90 F. Supp. 3d 493, 509 (M.D.N.C. 2015) (collecting cases).

13

F.3d 88, 95–96 (2d Cir. 2003); *Enforcement Guidance*, 2000 WL 33407181, at *3. If the plaintiff does so, then the burden shifts to the employer to show that the examination or inquiry, and the resulting disclosure of medical information, was job related and consistent with business necessity. *See Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (employer has the burden to show business necessity in medication examination case); *Jackson v. Regal Beloit Am., Inc.*, No. 16-134-DLB-CJS, 2018 WL 3078760, at *5 (E.D. Ky. June 21, 2018) (same); *Conroy*, 333 F.3d at 97–98 (in a case where employer required employee to disclose a "general diagnosis" to take sick leave, framing business necessity as an issue requiring proof by the employer); *Pa. State Troopers Ass'n v. Miller*, 621 F. Supp. 2d 246, 252 (M.D. Pa. 2008) (framing claim under 42 U.S.C. § 12112(d)(4)(A) in terms of burden-shifting).

Courts have held in many circumstances that policies requiring employees to disclose their prescriptions to the employer can be an "inquiry" that is likely to lead to disclosure of "whether such employee is an individual with a disability or as to the nature or severity of the disability" under 42 U.S.C. § 12112(d)(4)(A). *Roe v. Cheyenne Mountain Conference Resort, Inc*., 124 F.3d 1221, 1227, 1229 (10th Cir. 1997); *Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1084–85 (S.D. Cal. 2010); *Enforcement Guidance*, 2000 WL 33407181, at *3; *see also Lee*, 636 F.3d at 254 (noting in dicta that "[o]bviously, asking an employee whether he is taking prescription drugs or medication . . . trigger[s] the ADA's . . . protections"). While there are some nuances in how the courts evaluate whether a particular inquiry policy is likely to lead to disclosure of a disability, compare *Bates*, 767 F.3d at 579 (noting a factual dispute as to whether

14

employer "asked employees about their general prescription-drug usage" or had a narrower policy not likely to lead to disclosure of a disability), with *Conroy*, 333 F.3d at 95–96 (holding that requiring an employee to tell the employer his "general diagnosis" in order to take sick leave "trigger[s] the protections of the ADA"), the Court need not get into the weeds, since for purposes of the summary judgment motion, Loflin has not contested this element.

Instead, Loflin focuses on the business necessity defense. The ADA "permits employers to make inquiries . . . when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." *Porter,* 125 F.3d at 246 (quoting 29 C.F.R. Part 1630, App. § 1630.14(c)); *Leonard v. Electro-Mech. Corp.*, 36 F. Supp. 3d 679, 685 (W.D. Va. 2014). The determination of whether a prescription drug disclosure requirement is job-related and consistent with business necessity is an objective inquiry. *See, e.g.*, *Tice v. Ctr. Area Transp. Auth.,* 247 F.3d 506, 518 (3d Cir. 2001) (addressing medical exams); *Leonard*, 36 F. Supp. 3d at 686.

While it seems clear that business necessity must be based on more than "mere expediency," *Conroy*, 333 F.3d at 97–98; *see also Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007), the scope of the business necessity defense is not well-defined by the case law. In the medical examination context, the EEOC interprets the statute to require the employer asserting business necessity to have "a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a

15

medical condition," *Enforcement Guidance*, 2000 WL 33407181, at *6,[9] and courts

agree. *See Leonard*, 36 F. Supp. 3d at 685–86 (collecting cases).

In the context of prescription drug disclosure requirements, the EEOC has

interpreted the statute to prohibit across-the-board inquiries about all prescription

medications taken by employees, unless the employer can demonstrate that "it *is* job-

related and consistent with business necessity to require employees in positions affecting

public safety to report when they are taking medication that may affect their ability to

perform essential functions. Under these limited circumstances, an employer must be

able to demonstrate that an employee's inability or impaired ability to perform essential

functions will result in a direct threat." *Enforcement Guidance*, 2000 WL 33407181, at

*9.[10] Courts have indicated that the employer must show a connection between

plaintiff's specific job and the drugs prescribed, *see Wyland v. Boddie-Noell Enters., Inc.*,

165 F.3d 913 (Table), 1998 WL 795173, at *3 (4th Cir. Nov. 17, 1998) (case involving

required drug screens); *Roe v. Cheyenne Mtn. Conference Resort*, 920 F. Supp. 1153,

---

[9] EEOC regulations define "direct threat" as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation," and the determination of risk must be based on "an individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r) (listing factors in such assessment).

[10] The EEOC Enforcement Guidance gives these examples: "For example, a police department could require armed officers to report when they are taking medications that may affect their ability to use a firearm or to perform other essential functions of their job. Similarly, an airline could require its pilots to report when they are taking any medications that may impair their ability to fly. A fire department, however, could not require fire department employees who perform only administrative duties to report their use of medications because it is unlikely that it could show that these employees would pose a direct threat as a result of their inability or impaired ability to perform their essential job functions." 2000 WL 33407181, at *9.

Case 1:18-cv-00813-CCE-LPA   Document 51   Filed 05/22/20   Page 16 of 28

1154–55 (D. Colo. 1996), *aff'd in relevant part*, 124 F.3d 1221 (10th Cir. 1997); and that the inquiry must be "no broader or more intrusive than is necessary to further that business necessity." *Taylor v. City of Shreveport*, No. 13-2227, 2016 WL 4468256, at *3 & n.4 (W.D. La. Aug. 24, 2016) (Rehabilitation Act case, quoting *Conroy*, 333 F.3d at 97–98).

Here, it is undisputed that Loflin's shop floor could be a dangerous place. But there are disputed questions of material fact about the intended scope of the disclosure policy, how the policy was actually applied, and whether the policy as applied was overbroad and whether it was objectively reasonable.[11] Loflin's evidence is that it only required disclosure of narcotic prescriptions, and that such disclosure was necessary for employee safety, given the dangers of working on or walking through the factory floor. The EEOC's evidence is that Loflin required disclosure of all prescriptions, even those that could not possibly have any impact on worker safety, even those that were taken at night or outside of work hours, and even if the employee never took the medicine at all. And there is significant evidence that Loflin terminated Ms. Shrock without any inquiry into whether her prescription was a narcotic, which further supports the EEOC's view of the evidence. These disputed questions counsel against summary judgment.

---

[11] Loflin also defends the policy as to Ms. Shrock because she occasionally drove a company vehicle. *See* Doc. 36 at 15–16. It is not clear that this actually motivated Loflin's policy, which only mentioned the use of and working around heavy machinery in connection with prescription drug use, Doc. 34-8, to the extent that might be relevant; as to driving company cars, the policy only prohibited use of alcohol or illegal drugs and did not address disclosure. *See id.* In any event, it is not clear that the policy was tailored to meet the legitimate concern that drivers of company cars not be impaired by medication.

17

Loflin contends Ms. Shrock was not subject to a medical inquiry because she voluntarily disclosed her prescription. But that contention is inconsistent with the evidence. Indeed, Loflin's own evidence is that she was fired for violating the policy because she did <u>not</u> disclose the prescription, so it is difficult to understand how she was not subjected to the policy. Moreover, the only published appellate case cited by Loflin involved a claim of wrongful disclosure of confidential medical information, not an ADA medical inquiry claim, *Hannah P. v. Coats*, 916 F.3d 327, 340–41 (4th Cir. 2019), and an unpublished case cited by Loflin explicitly said it need not resolve whether a medical inquiry claim is precluded by a voluntary disclosure. *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 610 (11th Cir. 2008).

Even if voluntary disclosure is a defense to the medical inquiry aspect of her claim, as one case cited by Loflin seems to hold, by definition the disclosure must be voluntary. *See Parsons v. First Quality Retail Servs., LLC*, No. 5:10-CV-145 (CAR), 2012 WL 174829, at *7 (M.D. Ga. Jan. 20, 2012). Here, the EEOC's evidence reflects that Ms. Shrock did not gratuitously volunteer the fact she was taking a muscle relaxant to her coworkers. It was only after Ms. Hardee informed Ms. Shrock that she had been selected for a drug test that Ms. Shrock then said she was taking this medication. In this context, a reasonable jury could find Ms. Shrock's disclosure was not voluntary. Loflin's motion for summary judgment will be denied as to this claim.

## II. Termination Claim: Prescription Disclosure

The EEOC also contends that Loflin's termination of Ms. Shrock's employment based on her failure to comply with the prescription disclosure policy violated the ADA.

18

Doc. 38 at 14. While the elements of this unlawful termination claim are not completely clear, it seems logical that if the prescription drug disclosure policy was overbroad and not justified by business necessity, either generally or as applied to an office worker like Ms. Shrock, and she was terminated for violating that illegal policy, then Loflin's act in terminating her violated the ADA.[12]

As already discussed, there are disputed questions of fact as to whether the policy was justified by business necessity. And while Loflin has presented some evidence that it had other reasons to terminate Ms. Shrock's employment, its own employees gave written statements on the day of Ms. Shrock's termination that she was discharged because she did not disclose her prescription. This question too is disputed. Thus, summary judgment is inappropriate.

## III.   Termination Claim: Disability

In the alternative to the discriminatory termination claim based on Ms. Shrock's violation of the prescription drug disclosure policy, the EEOC contends that Loflin fired her because of a disability. Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . ." 42 U.S.C. § 12112(a); *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 233 (4th Cir. 2016). Plaintiffs can prove an ADA claim by direct or indirect evidence or by use of the burden-shifting

---

[12] In their briefing, neither party clearly laid out the facts the EEOC will have to prove to prevail on this claim, and the Court does not mean to rule on that issue definitively. This kind of claim doesn't seem to fit into the usual *McDonnell Douglas* framework, especially since there is direct evidence Ms. Shrock was fired for violating the prescription drug disclosure policy.

scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 303 (4th Cir. 1998).

Under the *McDonnell Douglas* burden-shifting scheme, the plaintiff must first establish a prima facie case of discrimination by showing (1) that she has a disability or was regarded by her employer as having a disability, (2) that she is a qualified individual for the employment in question, and (3) that she was discharged because of her disability. *See McLeod Health*, 914 F.3d at 883. If she does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination. *Leonard*, 36 F. Supp. 3d at 688 (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995)). If the employer produces enough evidence on this point, the plaintiff must then show why the employer's asserted justification is a pretext for discrimination. *Id.*

The EEOC offers no direct or indirect evidence that Ms. Shrock was terminated because of a disability. Doc. 38 at 14–15. It relies on the burden-shifting mechanism from *McDonnell Douglas* to establish circumstantial evidence of discrimination. *See id.* Loflin contends that there is no evidence that Ms. Shrock was disabled or that Loflin regarded her as disabled as of the date of her termination.[13]

As is relevant here, a person has a disability under the ADA if she has "a physical . . . impairment that substantially limits one or more major life activities," or if she is "regarded as having such an impairment." 42 U.S.C. § 12102(1). Ms. Shrock must meet

---

[13] Loflin made no argument as to the other elements of the prima facie case: Ms. Shrock's qualifications and causation.

Case 1:18-cv-00813-CCE-LPA   Document 51   Filed 05/22/20   Page 20 of 28

this definition as of the day that Loflin fired her. *EEOC v. Mfrs. & Traders Tr. Co.*, No. ELH-16-3180, --- F. Supp. 3d ---, 2019 WL 7037614, at *10 (D. Md. Dec. 19, 2019) (citing *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 379 (4th Cir. 2000)).

Not every impairment will constitute a disability within the meaning of the ADA, but an impairment will meet the definition if "it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 670 (4th Cir. 2019) (quoting 28 C.F.R. § 36.105(d)(1)(v)). In considering whether an impairment substantially limits an individual in a major life activity, courts "construe the statutory text broadly in favor of expansive coverage, keeping in mind that the language is not meant to be a demanding standard." *J.D. by Doherty*, 925 F.3d at 670 (quoting 28 C.F.R. § 36.105(d)(1)(i)). This interpretation is consistent with the purpose of the ADA Amendments Act of 2008, which was passed to "reinstat[e] a broad scope of protection to be available under the ADA." *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014).

Conditions that affect the musculoskeletal system are among the impairments that can give rise to a disability. 29 C.F.R. § 1630.2(h)(1); *see also* 29 C.F.R. § 1630.2(i)(1)(ii) (operation of the musculoskeletal system, including "an individual organ" within it, is a major life activity).[14] A "major life activity" is in turn defined to include

---

[14] By amending the ADA in 2008, Congress enacted a broader understanding of the term "disabled" than the EEOC and the courts had previously applied. *Gentry*, 816 F.3d at 237; *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 573 (4th Cir. 2015).

21

"basic tasks that are part of everyday living, such as caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, and lifting." *Class v. Towson Univ.*, 806 F.3d 236, 245 (4th Cir. 2015) (quoting 42 U.S.C. § 12102(2)(A) and providing a non-exhaustive list).

If Ms. Shrock proceeds under the "regarded as" prong, the EEOC need not show an impairment that substantially limits a major life activity, 29 C.F.R. § 1630.2(g)(3), but an employer's "[m]ere knowledge of symptoms alone is not sufficient proof that an employer regarded an employee as disabled." *Powers v. Covestro LLC*, No. 2:16-cv-05253, 2017 WL 1952230, at *4 (S.D.W. Va. May 10, 2017). The employer must actually perceive that the employee has a physical impairment. 29 C.F.R. § 1630.2(l). In other words, the focus remains on the employer's perception of Ms. Shrock's functional limits, even if these limits would not otherwise amount to an actual disability.

First, there is no genuine issue of material fact as to whether Loflin regarded Ms. Shrock as disabled. The Loflin co-owners knew before they fired Ms. Shrock that she was taking a prescription medication for neck pain, but there is no evidence that they knew anything about any diagnosis she had received or that her employer knew or suspected her neck pain had any impact on her functioning. Doc. 38-3 at 25–26 (139:3–140:4); Doc. 36-3 at 29–30 (142:19–143:10).[15] All the evidence is that Ms. Shrock had

---

[15] Ms. Hardee testified as a 30(b)(6) deponent that Loflin found out on the day of the drug test that Ms. Shrock took a muscle relaxant for her neck. Doc. 38-3 at 28 (152:15–19). Ms. Shrock testified that she had mentioned her January doctor's visit to a colleague, but she did not remember exactly what she said, nor did she recall any other conversations about her neck pain with anyone at work before the day of the drug test. Doc. 36-3 at 19–21 (83:18–25, 86:2–87:23).

done her work without asking for any accommodations, and at most she mentioned her neck pain in passing, several months before her termination. An employer's knowledge that an employee has neck pain and takes medication for it is insufficient to prove that the employer "regarded" the employee as disabled. *See Powers*, 2017 WL 1952230, at *4.

Whether the evidence is sufficient to support a finding that Ms. Shrock was actually disabled on the day she was terminated is a somewhat closer question. But the Court concludes that the scintilla of evidence favoring the EEOC is not enough for a rational trier of fact to reasonably find she was disabled when she was terminated. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–52 (1986).

Viewing the evidence in the light most favorable to the EEOC, one could infer that during the nine months before she was terminated, Ms. Shrock intermittently experienced neck pain that affected her ability to turn her head, possibly with some occasional tingling down her arms and headaches; that she saw a doctor for this pain once; and that every two or three months, including the day before she was fired, the pain was bad enough that she took a prescribed muscle relaxant so she could sleep. One could also find based on direct evidence that some three weeks after her termination, she was diagnosed with cervical disc disorder with radiculopathy.

While pain can be disabling and it need not be constant, surely it must be more than this. *See Douglas v. Ready Mixed Concrete Co.*, No. 5:09-CV-354, 2010 WL 4496797, at *3–4 (E.D.N.C. Nov. 1, 2010) (granting summary judgment for employer where discharged employee had "incurred some form of back injury" and experienced pain, but had not shown its impact on a major life activity); *see also* 29 C.F.R. §

23

1630.2(j)(4)(ii) (noting that "pain experienced when performing a major life activity" is a factor that may assist in determining whether an individual is substantially limited in such an activity, focusing on function, rather than a particular symptom). This is especially so when there is no evidence that her symptoms had a substantial effect on even one particular life activity, and there is affirmative evidence from family members, who knew of her neck pain, that it did not result in any limitations in function and from Ms. Shrock herself that the pain did not interfere with her ability to work.

The evidence that she had cervical disc disorder at the time she was fired on September 22 is vague. Both her own testimony and her physician's testimony refer to "September 2017," without specifying whether that disorder was likely present on the date she was fired. *See Mfrs. & Traders Tr. Co.*, 2019 WL 7037614, at *10 (disability must be present at the time of termination). And while her doctor affirmed that the disorder would be "limiting to normal function," Doc. 38-4 at ¶¶ 3, 5, he did not identify or explain what activities or functions would be limited nor to what extent. Ms. Shrock's testimony does not fill in these gaps. The EEOC's cited authority, Doc. 38 at 15–16, supports the view that similar diagnoses may be disabilities under the ADA, but in those cases, unlike here, the treating physicians documented and explained the physical limitations experienced by the employees.

Although the term "substantially limits" should be construed broadly, *J.D. by Doherty*, 925 F.3d at 670, it is not a meaningless requirement. The EEOC has produced evidence of Ms. Shrock's impairment—an intermittent ability to turn her neck, possibly

with some intermittent tingling—but there is no indication it crossed the line into a substantial limitation on her functioning.

Because the EEOC has not produced evidence sufficient to meet the first element in a prima facie case of discriminatory discharge, Loflin's motion for summary judgment will be granted as to this claim.

## IV. Punitive Damages

Punitive damages are available on an ADA claim if the plaintiff proves, *inter alia*, that the employer "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of [the employee]." *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 371 (4th Cir. 2008) (quoting 42 U.S.C. § 1981a(b)(1)); *see also Ward v. Autozoners, LLC*, Nos. 18-2100, 18-2170, --- F.3d ---, 2020 WL 2312862, at *8 (4th Cir. May 11, 2020) (noting courts look for "distinct intentionality" by the manager that "elevate[s] the actions . . . above mere negligence to reckless indifference").[16] The focus is on the employer's state of mind. *Fed. Express*, 513 F.3d at 371.

While proof of "actual malice" certainly suffices, it is not necessary; punitive damages may be appropriate "if, at a minimum, the plaintiff is able to prove 'recklessness in its subjective form.'" *Id.* at 371 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). The employer need not have known it was engaging in discrimination, *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 442 (4th Cir. 2000) (quoting *Kolstad*,

---

[16] With the passage of the Civil Rights Act of 1991, punitive damages can be available under the ADA. *See Cline*, 144 F.3d at 306; 42 U.S.C. 1981a(b)(1). The same provision enables punitive damages under Title VII, *see Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 548 (4th Cir. 2003), which means Title VII case law is instructive in this context.

25

527 U.S. at 535), but it must have acted "in the face of a perceived risk that its actions would violate federal law." *Fed. Express*, 513 F.3d at 371 (quoting *Kolstad*, 527 U.S. at 539). If the employer's managerial agent had "at least a rudimentary knowledge of the import of a federal anti-discrimination statute," and the underlying conduct is egregious enough to reflect on the agent's state of mind, that may be sufficient evidence to support a jury finding of perceived risk. *See Fed. Express*, 513 F.3d at 372–73 (quoting *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 460 (4th Cir. 2002)). But "[p]unitive damages are an extraordinary remedy," and the EEOC has "a high standard to meet" in carrying its burden of proof. *Ward*, 2020 WL 2312862, at *8–9.

It is not clear if the EEOC is seeking punitive damages based on Loflin's prescription drug disclosure policy alone, based on Ms. Shrock's termination for violating that policy, or based on both. Whatever its theory, the EEOC has not offered adequate proof to support the requisite state of mind.[17]

There is no evidence of actual malice, either direct or circumstantial. And while there is evidence that the owners and decisionmakers had some basic knowledge of the ADA, the alleged violations are not so egregious that reckless indifference can be inferred.

---

[17] There are other facts the plaintiff must prove to recover punitive damages, but they are not at issue here. The employee must demonstrate that liability for punitive damages should be imputed to the employer—meaning that the decisions to implement the drug disclosure policy and to fire Ms. Shrock were made by a manager who was acting within the scope of his employment. *Anderson*, 281 F.3d at 460. Loflin does not contest this, *see* Doc. 36 at 19–20; Doc. 43 at 6–7, in light of the evidence that the co-owners required the disclosure policy and that they fired Ms. Shrock. Even if all three facts are proven, the employer can avoid punitive damages if it proves it engaged in good-faith efforts to comply with federal antidiscrimination law. *Anderson*, 281 F.3d at 460.

26

Here, the Loflin co-owners appear to have some knowledge of the ADA, arising from their own online research rather than formal training. *See* Doc. 38-8 at 6 (8:11–17) (Mr. Loflin); Doc. 38-9 at 6 (11:5–17) (Mr. Ferrell). Both co-owners knew that an employer could not ask current employees "[a]bout any disability," Doc. 38-9 at 5 (10:17–19), nor information that is likely to reveal a disability. Doc. 38-9 at 15 (20:8–18); Doc. 38-8 at 6 (8:2–6). Mr. Loflin further stated that an employer could require an employee to disclose disability-related information "[i]f it pertains to his job." Doc. 38-8 at 8 (12:9–12). This reflects a basic, even if incomplete, knowledge of anti-discrimination law.

The evidence is undisputed that employees present on the factory floor at Loflin needed to have their wits about them to avoid accidents. Many operated heavy machinery, and anyone who walked through the plant had to be careful of large pieces of metal being moved, of forklifts and lasers, and of other potentially dangerous items. There was a clear and obvious risk of personal injury and property damage if someone under the influence of a medication that impaired reaction time was on the factory floor or operating this equipment. And, as discussed *supra*, the law on the legality of prescription drug inquiries under the ADA is not necessarily clear in the circumstances of this case.

While there are factual questions as to whether Loflin's policy was overbroad generally and as applied to office workers like Ms. Shrock who were only on the floor from time to time, *see* discussion *supra*, it can hardly be doubted that Loflin needed to be sure its workers would not be injured as a result of an impaired employee's carelessness

or lack of attention. Even on the EEOC's version of the facts, punitive damages for an overbroad policy would be inappropriate.

It is **ORDERED** that the defendant Loflin Fabrication's motion for summary judgment, Doc. 33, is **GRANTED in part and DENIED in part,** as follows:

1. The plaintiff's claims for wrongful termination of Deborah Shrock based on a disability and for punitive damages are **DISMISSED**; and

2. The motion is **DENIED** as to plaintiff's claims for wrongful medical inquiry and for wrongful termination of Deborah Schrock for violation of a wrongful medical inquiry policy, which remain for trial.

This the 22nd day of May, 2020.

_____
UNITED STATES DISTRICT JUDGE